Charles R. Jacob III
Haynee C. Kang
MILLER & WRUBEL P.C.
250 Park Avenue
New York, New York 10177
(212) 336-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TERWIN WAREHOUSE MANAGEMENT LLC, as Program Administrator for and Assignee of TERWIN MORTGAGE WAREHOUSE TRUST II, SERIES XVI, and TERWIN ADVISORS LLC,

      Plaintiffs,

-against-

SPECTRUM FINANCIAL GROUP, INC., JERRY CRAIG, SR. and JERRY CRAIG, JR.,

      Defendants.

07 Civ. 5632 (LTS)
ECF CASE

**DECLARATION OF BARBARA CHELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST JERRY CRAIG, SR. AND JERRY CRAIG, JR.**

---

The undersigned, BARBARA CHELL, declares as follows:

1. I am a principal of plaintiffs Terwin Warehouse Management LLC ("TWM") and Terwin Advisors LLC ("TA"). My responsibilities include the matters that are the subject of this declaration. Except as may otherwise be indicated, I have first-hand knowledge of the matters set forth herein.

2. I submit this Declaration in support of TWM's and TA's motion for summary judgment on their claims against defendants Jerry Craig, Sr. ("Craig Sr.") and Jerry Craig, Jr. ("Craig Jr.") (collectively, the "Craigs") in this action.

**The Parties**

3.  TWM is a limited liability company ("LLC") organized under the laws of the State of Delaware with its principal place of business at 45 Rockefeller Plaza, Suite 420, New York, New York 10111. TWM is engaged in the business of purchasing, selling and lending with respect to mortgage loans.

4.  TA is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 45 Rockefeller Plaza, Suite 420, New York, New York 10111. TA is engaged in the business of purchasing, selling and securitizing mortgage loans.

5.  TWM's and TA's members, and the members of LLCs that are members of TWM and/or TA, are citizens of New York, New Jersey and California. None is a citizen of Arizona.

6.  TWM is the Program Administrator for Terwin Mortgage Warehouse Trust II, Series XVI (the "Trust"), pursuant to a Seller's Purchase, Warranties and Servicing Agreement dated as of June 17, 2005 (the "Warehouse Purchase Agreement"), a copy of which is annexed as Exhibit A, between the Trust as Purchaser and defendant Spectrum Financial Group, Inc. ("Spectrum") as Seller.[1]

7.  The Trust is a Delaware statutory trust with its principal place of business at 45 Rockefeller Plaza, Suite 420, New York, New York 10111. The Trust's principal purpose is to purchase, own and sell mortgage loans.

8.  Pursuant to the Warehouse Purchase Agreement, TWM acts as Program Administrator for the Trust. The Warehouse Purchase Agreement provides, in

---

[1] Hereafter, capitalized terms not otherwise defined are used with the meanings set forth for them in the Warehouse Purchase Agreement or the Loan Purchase Agreement (as defined below.)

Section 1.01 (definition of "Purchaser"), that "[t]he duties, rights and obligations of the Purchaser [the Trust] hereunder shall from time to time be performed or enforced, as applicable, by the Program Administrator . . . ." Accordingly, TWM brings its claims in this action as Program Administrator and assignee of the Trust's claims against defendants to enforce the rights of the Trust against defendants. Such assignment is expressly permitted by Section 13.12 of the Warehouse Purchase Agreement.

9. Terwin's records show that Spectrum is a closely-held corporation organized under the laws of the State of Arizona with its principal place of business at 7047 E. Greenway Parkway, Suite 400, Scottsdale, AZ 85254.[2]

10. Terwin's records show that the Craigs are residents and citizens of the State of Arizona, are the principals of Spectrum, and control its actions.

### The Warehouse Purchase Agreement and Guarantees

11. In the Warehouse Purchase Agreement, Spectrum and the Trust contracted for Spectrum to sell to the Trust certain Mortgage Loans, subject to the terms and conditions in the Purchase Agreement. In § 13.21 of the Warehouse Purchase Agreement, Spectrum expressly consented to the exclusive jurisdiction and venue of this Court as to any claim relating to the Warehouse Purchase Agreement.

12. On or about June 17, 2005, Craig Sr. executed a Guaranty (the "Craig Sr. Guaranty"), a copy of which is annexed as Exhibit B, unconditionally and irrevocably guaranteeing to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase Agreement. In § 10.6 of the Craig Sr. Guaranty, Craig Sr. expressly consented to

---

[2] I am informed that Spectrum filed for bankruptcy in August 2007.

3

the exclusive jurisdiction and venue of this Court as to any claim relating to the Craig Sr. Guaranty.

13. On or about June 17, 2005, Craig Jr. executed a Guaranty (the "Craig Jr. Guaranty"), a copy of which is annexed as Exhibit C, unconditionally and irrevocably guaranteeing to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase Agreement. In § 10.6 of the Craig Jr. Guaranty, Craig Jr. expressly consented to the exclusive jurisdiction and venue of this Court as to any claim relating to the Craig Jr. Guaranty.

**Spectrum's Failure to Remit Margin Deficit
Under the Warehouse Purchase Agreement**

14. Pursuant to the Warehouse Purchase Agreement, the Trust purchased from Spectrum a substantial number of Mortgage Loans.

15. The Trust and TWM have fully performed all their obligations under and relating to the Warehouse Purchase Agreement.

16. Under the Warehouse Purchase Agreement, a Mortgage Loan purchased by the Trust is to be further conveyed or sold to a takeout investor ("Takeout Investor"), identified by Spectrum in a transaction arranged by Spectrum, within 45 days after the Closing Date of the Trust's purchase of such Mortgage Loan. Such a further conveyance is referred to as a Settlement, taking place on a Settlement Date.

17. Pursuant to § 12.04 of the Warehouse Purchase Agreement, if a Settlement Date for any Mortgage Loan has not occurred within 45 days after the Closing Date for that Mortgage Loan, a "Required Sale Event" has occurred with respect to that

Mortgage Loan. Upon the occurrence of a Required Sale Event, TWM may cause the Trust to sell the Mortgage Loans for which a required Sale Event has occurred.

18. With respect to the following four (4) Mortgage Loans (the "Required Sale Mortgage Loans"), Spectrum failed to arrange a Settlement Date within 45 days after the related Closing Date:

> Smith - No. 303714750
>
> Smith - No. 303714751
>
> Turner - No. 303714752
>
> Thomson - No 303727043

19. Commencing in May 2007, TWM as Program Administrator sent notices to Spectrum concerning its failure to arrange Settlement Dates for the Required Sale Mortgage Loans within 45 days after the related Closing Dates and stated that, because of Spectrum's failure to arrange Settlement Dates for the Required Sale Mortgage Loans, TWM would need to sell the Required Sale Mortgage Loans.

20. Spectrum failed to take action in response to the notices TWM sent Spectrum concerning the Required Sale Mortgage Loans.

21. On or about June 1, 2007, pursuant to § 12.04 of the Warehouse Purchase Agreement, the Trust, through TWM, arranged to sell the Required Sale Mortgage Loans, as a result of which the Trust incurred an economic loss in the amount of the difference between the Adjusted Purchase Price of the Required Sale Margin Loans and the Market Value of those loans (such loss, the "Margin Deficit"). The Margin Deficit resulting from the sale of the Required Sale Margin Loans was $262,699.93.

22. Section 12.03 of the Warehouse Purchase Agreement requires Spectrum, upon request, to remit to the Trust the amount of the Margin Deficit.

23. On or about June 1, 2007, pursuant to § 12.03 of the Warehouse Purchase Agreement, TWM sent defendants notice requesting them to transfer to the Trust the Margin Deficit, in the amount of $262,699.93. Attached as Exhibit D is a copy of a demand letter sent by TWM to defendants on June 1, 2007, demanding that defendants pay the $262,699.93 in Margin Deficit.

24. In breach of the Warehouse Purchase Agreement, defendants failed to remit the Margin Deficit of $262,699.93 to the Trust.

25. Pursuant to the Craig Sr. Guaranty, Craig Sr. unconditionally and irrevocably guaranteed to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase Agreement. Spectrum is obligated to the Trust under the Warehouse Purchase Agreement as set forth above.

26. Accordingly, a money judgment should be entered against Craig Sr., and in favor of TWM, on TWM's claim on the Craig Sr. Guaranty (Fourth Cause of Action) for the unpaid Margin Deficit of $262,699.93 set forth above, plus interest from June 1, 2007 to date.

27. Pursuant to the Craig Jr. Guaranty, Craig Jr. unconditionally and irrevocably guaranteed to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase Agreement. Spectrum is obligated to the Trust under the Warehouse Purchase Agreement as set forth above.

28. Accordingly, a money judgment should be entered against Craig Jr., and in favor of TWM, on TWM's claim on the Craig Jr. Guaranty (Fifth Cause of Action) for the unpaid Margin Deficit of $262,699.93 set forth above, plus interest from June 1, 2007 to date.

29. With respect to the Fourth and Fifth Causes of Action (under the Craig Sr. and Jr. Guarantees), the rate of interest is running at the amount of $64.78 *per diem*. This amount is computed by multiplying the Margin Deficit of $262,699.93 by the New York statutory interest rate of 9%, and dividing the result by 365 days.

### The Craigs' Conversion of PIF Payments

30. On or about January 10, 2005, TA and Spectrum entered into a Seller's Purchase, Warranties and Interim Servicing Agreement (the "Loan Purchase Agreement"), an excerpted copy of which is annexed as Exhibit E, pursuant to which Spectrum and TA contracted for Spectrum to sell to TA certain Mortgage Loans (as defined in the Loan Purchase Agreement), subject to the terms and conditions in the Loan Purchase Agreement.

31. Pursuant to the Loan Purchase Agreement, TA purchased from Spectrum a substantial number of Mortgage Loans. TA has fully performed all its obligations under and relating to the Loan Purchase Agreement.

32. Section 2.02 of the Loan Purchase Agreement provides:

> With respect to each Mortgage Loan, the Purchaser [TA] shall be entitled to (1) the principal portion of all Monthly Payments due after the Cut-off Date, (2) <u>all other recoveries of principal collected on or after the Cut-off Date</u> (provided, however, that the principal portion of all Monthly Payments due on or before the Cut-off Date and collected by the Servicer or any successor servicer after the Cut-off Date shall belong to the Seller), and (3) <u>all payments of interest on the Mortgage Loans</u> (minus that portion of any such payment which is allocable to the period prior to the Cut-off Date).

7

[Emphasis added.]

33. After the Cut-Off Date (as defined in the Loan Purchase Agreement) for two Mortgage Loans, referred to as the Cardwell no. 100078791/1061552[3] and the Cardwell no. 100082377/10610551 Mortgage Loans (the "PIF Mortgage Loans"), the PIF Mortgage Loans were paid in full ("PIF") by Cardwell, the borrower thereon.

34. However, the borrower Cardwell mistakenly sent the payoff payments on the PIF Mortgage Loans, in the aggregate amount of $1,222,129.01 (the "PIF Payments"), to Spectrum, which was no longer the owner of the PIF Mortgage Loans after the Cut-Off Date, rather than to TA or its servicer. Attached hereto as Exhibit F is a copy of a fax Spectrum sent TA on April 30, 2007, stating that the PIF Mortgage Loans "were paid in full to Spectrum Financial Group."

35. The PIF Payments received by Spectrum on the PIF Mortgage Loans after the Cut-Off Date did not belong to Spectrum or the Craigs because TA, as Purchaser, owned the PIF Mortgage Loans and was expressly entitled to the PIF Payments under § 2.02 of the Loan Purchase Agreement.

36. On several occasions, continuing through June 4, 2007, TA demanded that Spectrum and the Craigs forward the PIF Payments to TA as required by §§ 2.02 and 7.01 of the Loan Purchase Agreement, and applicable law. Attached hereto as Exhibit G is a copy of a demand letter sent by TA to Spectrum on June 4, 2007, demanding that Spectrum remit TA's funds of $1,222,129.01.

37. Spectrum and the Craigs acknowledged that the PIF Payments belonged to TA, but failed and refused to forward the PIF Payments to TA.

---

[3] The first number, 100078791, is TA's identification number for the loan, and the second number, 1061552, is Spectrum's identification number for the loan.

8

38. Spectrum's and the Craigs' retention of the PIF Payments was an intentional and unauthorized exercise of control over property belonging to TA, interfering with the lawful right of possession of TA in the PIF Payments.

39. As the responsible officers of Spectrum, Craig Sr. and Craig Jr. controlled Spectrum and caused it to engage in this conduct towards TA with full awareness that the PIF Payments belonged to TA and intending to interfere with TA's lawful right of possession in the PIF Payments.

40. Accordingly, a money judgment should be entered in favor of TA and against Craig Sr. and Craig Jr., jointly and severally, for conversion (Sixth Cause of Action), in the amount of $1,222,129.01, plus interest from April 30, 2007, the date that Spectrum first acknowledged that it was exercising dominion and control over the PIF Payments, to date.

41. With respect to the Sixth Cause of Action for conversion, the rate of interest is running at the amount of $301.35 *per diem*. This amount is computed by multiplying the PIF Payments of $1,222,129.01 by the New York statutory interest rate of 9%, and dividing the result by 365 days.

## Conclusion

42. Plaintiffs respectfully request that the Court grant summary judgment on the Fourth, Fifth and Sixth Causes of Action and enter a money judgment in the total of these amounts:

- Fourth and Fifth Causes of Action on TWM's claims on the Craig Sr. and Craig Jr. Guarantees for unpaid Margin Deficit of $262,699.93; plus

- Interest on the Fourth and Fifth Causes of Action from June 1, 2007 (the date TWM sent Spectrum notice requesting it to transfer to the Trust the Margin Deficit, in the amount of $262,699.93) to the date of judgment at a rate of $64.78 *per diem*; plus

- Sixth Cause of Action on TA's claim against the Craigs for conversion of PIF Payments in the amount of $1,222,129.01; plus

- Interest on the Sixth Cause of Action from April 30, 2007, the date that Spectrum first acknowledged that it was exercising domination and control over the PIF Payments, to the date of judgment at a rate of $301.35 *per diem*.

43. No part of the total requested judgment amount has been paid.

44. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 5, 2007

_____
BARBARA CHELL