Charles R. Jacob III
Haynee C. Kang
MILLER & WRUBEL P.C.
250 Park Avenue
New York, New York 10177
(212) 336-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TERWIN WAREHOUSE MANAGEMENT
LLC, as Program Administrator for and
Assignee of TERWIN MORTGAGE
WAREHOUSE TRUST II, SERIES XVI, and
TERWIN ADVISORS LLC,

                            Plaintiffs,

        -against-

SPECTRUM FINANCIAL GROUP, INC.,
JERRY CRAIG, SR. and
JERRY CRAIG, JR.,

                            Defendants.

07 Civ. 5632 (LTS)
ECF CASE

**RULE 56.1 STATEMENT
IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT
AGAINST JERRY CRAIG, SR.
AND JERRY CRAIG, JR.**

        Plaintiffs Terwin Warehouse Management LLC ("TWM") and Terwin

Advisors LLC ("TA") submit this Statement pursuant to Local Civil Rule 56.1(a), in

support of TWM's and TA's motion for summary judgment on their claims against

defendants Jerry Craig, Sr. ("Craig Sr.") and Jerry Craig, Jr. ("Craig Jr.") (collectively,

the "Craigs") in this action.

### The Parties

        1.        TWM is a limited liability company organized under the laws of

the State of Delaware with its principal place of business at 45 Rockefeller Plaza, Suite

420, New York, New York 10111.  TWM is engaged in the business of purchasing,

selling and lending with respect to mortgage loans. (Declaration of Barbara Chell, dated December 5, 2007 ("Chell Declaration" or "Chell Decl.") ¶ 3).

2.    TA is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 45 Rockefeller Plaza, Suite 420, New York, New York 10111. TA is engaged in the business of purchasing, selling and securitizing mortgage loans. (Chell Decl. ¶ 4).

3.    TWM's and TA's members, and the members of LLCs that are members of TWM and/or TA, are citizens of New York, New Jersey and California. None is a citizen of Arizona. (Chell Decl. ¶ 5).

4.    TWM is the Program Administrator for Terwin Mortgage Warehouse Trust II, Series XVI (the "Trust"), pursuant to a Seller's Purchase, Warranties and Servicing Agreement dated as of June 17, 2005 (the "Warehouse Purchase Agreement"), a copy of which is annexed as Exhibit A to the accompanying Chell Declaration, between the Trust as Purchaser and defendant Spectrum Financial Group, Inc. ("Spectrum") as Seller.[1]  (Chell Decl. ¶ 6 and Ex. A).

5.    The Trust is a Delaware statutory trust with its principal place of business at 45 Rockefeller Plaza, Suite 420, New York, New York 10111. The Trust's principal purpose is to purchase, own and sell mortgage loans. (Chell Decl. ¶ 7).

6.    Pursuant to the Warehouse Purchase Agreement, TWM acts as Program Administrator for the Trust. The Warehouse Purchase Agreement provides, in Section 1.01 (definition of "Purchaser"), that "[t]he duties, rights and obligations of the Purchaser [the Trust] hereunder shall from time to time be performed or enforced, as

---

[1] Hereafter, capitalized terms not otherwise defined are used with the meanings set forth for them in the Warehouse Purchase Agreement or the Loan Purchase Agreement (as defined below.)

applicable, by the Program Administrator . . . ." Accordingly, TWM brings its claims in this action as Program Administrator and assignee of the Trust's claims against defendants to enforce the rights of the Trust against defendants. Such assignment is expressly permitted by Section 13.12 of the Warehouse Purchase Agreement. (Chell Decl. ¶ 8 and Ex. A at pp. 12, 72).

7.    Spectrum is a corporation organized under the laws of the State of Arizona with its principal place of business at 7047 E. Greenway Parkway, Suite 400, Scottsdale, AZ 85254.[2] (Chell Decl. ¶ 9).

8.    The Craigs are residents and citizens of the State of Arizona, and are the principals of Spectrum. (Chell Decl. ¶ 10).

### The Warehouse Purchase Agreement and Guaranties

9.    In the Warehouse Purchase Agreement, Spectrum and the Trust contracted for Spectrum to sell to the Trust certain Mortgage Loans, subject to the terms and conditions in the Purchase Agreement. In § 13.21 of the Warehouse Purchase Agreement, Spectrum expressly consented to the exclusive jurisdiction and venue of this Court as to any claim relating to the Warehouse Purchase Agreement. (Chell Decl. ¶ 11 and Ex. A at p. 78).

10.    On or about June 17, 2005, Craig Sr. executed a Guaranty (the "Craig Sr. Guaranty"), a copy of which is annexed as Exhibit B to the Chell Declaration, unconditionally and irrevocably guaranteeing to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase Agreement. In § 10.6 of the Craig Sr. Guaranty, Craig Sr. expressly consented to the exclusive jurisdiction and venue of this Court as to any claim relating to

---

[2] Spectrum filed for bankruptcy in August 2007.

the Craig Sr. Guaranty. (Chell Decl. ¶ 12 and Ex. B at § 10.6; Declaration of Charles R.

Jacob III, dated December 6, 2007 ("Jacob Decl.") at ¶ 5 and Ex. B (Answer) at ¶ 5).

11.    On or about June 17, 2005, Craig Jr. executed a Guaranty (the

"Craig Jr. Guaranty"), a copy of which is annexed as Exhibit C to the Chell Decl.,

unconditionally and irrevocably guaranteeing to the Trust in an unlimited amount the due

and punctual payment and/or performance of all of Spectrum's obligations under the

Warehouse Purchase Agreement. In § 10.6 of the Craig Jr. Guaranty, Craig Jr. expressly

consented to the exclusive jurisdiction and venue of this Court as to any claim relating to

the Craig Jr. Guaranty. (Chell Decl. ¶ 13 and Ex. C at § 10.6; Jacob Decl. ¶ 5 and Ex. B

(Answer) at ¶ 5).

### Spectrum's Failure to Remit Margin Deficit
### Under the Warehouse Purchase Agreement

12.    Pursuant to the Warehouse Purchase Agreement, the Trust

purchased from Spectrum a substantial number of Mortgage Loans. (Chell Decl. ¶ 14).

13.    The Trust and TWM have fully performed all their obligations

under and relating to the Warehouse Purchase Agreement. (Chell Decl. ¶ 15).

14.    Under the Warehouse Purchase Agreement, a Mortgage Loan

purchased by the Trust is to be further conveyed or sold to a takeout investor ("Takeout

Investor"), identified by Spectrum in a transaction arranged by Spectrum, within 45 days

after the Closing Date of the Trust's purchase of such Mortgage Loan. Such a further

conveyance is referred to as a Settlement, taking place on a Settlement Date. (Chell Decl.

¶ 16 and Ex. A at p. 69).

15.    Pursuant to § 12.04 of the Warehouse Purchase Agreement, if a

Settlement Date for any Mortgage Loan has not occurred within 45 days after the Closing

Date for that Mortgage Loan, a "Required Sale Event" has occurred with respect to that Mortgage Loan.  Upon the occurrence of a Required Sale Event, TWM may cause the Trust to sell the Mortgage Loans for which a required Sale Event has occurred.  (Chell Decl. ¶ 17 and Ex. A at pp. 70-71).

16.    With respect to the following four (4) Mortgage Loans (the "Required Sale Mortgage Loans"), Spectrum failed to arrange a Settlement Date within 45 days after the related Closing Date:

Smith - No. 303714750

Smith - No. 303714751

Turner - No. 303714752

Thomson - No 303727043

(Chell Decl. ¶ 18).

17.    Commencing in May 2007, TWM as Program Administrator sent notices to Spectrum concerning its failure to arrange Settlement Dates for the Required Sale Mortgage Loans within 45 days after the related Closing Dates and stated that, because of Spectrum's failure to arrange Settlement Dates for the Required Sale Mortgage Loans, TWM would need to sell the Required Sale Mortgage Loans.  (Chell Decl. ¶ 19).

18.    Spectrum failed to take action in response to the notices TWM sent Spectrum concerning the Required Sale Mortgage Loans.  (Chell Decl. ¶ 20).

19.    On or about June 1, 2007, pursuant to § 12.04 of the Warehouse Purchase Agreement, the Trust, through TWM, arranged to sell the Required Sale Mortgage Loans, as a result of which the Trust incurred an economic loss in the amount

of the difference between the Adjusted Purchase Price of the Required Sale Margin Loans and the Market Value of those loans (such loss, the "Margin Deficit"). The Margin Deficit resulting from the sale of the Required Sale Margin Loans was $262,699.93. (Chell Decl. ¶ 21).

20.    Section 12.03 of the Warehouse Purchase Agreement requires Spectrum, upon request, to remit to the Trust the amount of the Margin Deficit. (Chell Decl. ¶ 22 and Ex. A at p. 70).

21.    On or about June 1, 2007, pursuant to § 12.03 of the Warehouse Purchase Agreement, TWM sent Spectrum notice requesting it to transfer to the Trust the Margin Deficit, in the amount of $262,699.93. Attached to the Chell Decl. as Exhibit D is a copy of a demand letter sent by TWM to defendants on June 1, 2007, demanding that defendants pay the $262,699.93 in Margin Deficit. (Chell Decl. ¶ 23 and Ex. D).

22.    In breach of the Warehouse Purchase Agreement, Spectrum failed to remit the Margin Deficit of $262,699.93 to the Trust. (Chell Decl. ¶ 24).

23.    Pursuant to the Craig Sr. Guaranty, Craig Sr. unconditionally and irrevocably guaranteed to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase Agreement. Spectrum is obligated to the Trust under the Warehouse Purchase Agreement as set forth above. (Chell Decl. ¶ 25 and Exh. B at § 1.1).

24.    Pursuant to the Craig Jr. Guaranty, Craig Jr. unconditionally and irrevocably guaranteed to the Trust in an unlimited amount the due and punctual payment and/or performance of all of Spectrum's obligations under the Warehouse Purchase

Agreement. Spectrum is obligated to the Trust under the Warehouse Purchase

Agreement as set forth above. (Chell Decl. ¶ 25 and Exh. C at § 1.1).

25.    Payment to TWM of the unpaid Margin Deficit of $262,699.93 on

June 1, 2007, was an obligation of Spectrum under the Warehouse Purchase Agreement.

Therefore, the Craigs are each liable to TWM for $262,699.93, plus interest from June 1,

2007 to the date of judgment at the amount of $64.78 *per diem*, under the Craig Sr.

Guaranty and the Craig Jr. Guaranty, respectively. (Chell Decl. ¶¶ 28-29).

### The Craigs' Conversion of PIF Payments

26.    On or about January 10, 2005, TA and Spectrum entered into a

Seller's Purchase, Warranties and Interim Servicing Agreement (the "Loan Purchase

Agreement"), a copy of which is annexed as Exhibit E to the Chell Decl., pursuant to

which Spectrum and TA contracted for Spectrum to sell to TA certain Mortgage Loans

(as defined in the Loan Purchase Agreement), subject to the terms and conditions in the

Loan Purchase Agreement. (Chell Decl. ¶ 30 and Ex. E).

27.    Pursuant to the Loan Purchase Agreement, TA purchased from

Spectrum a substantial number of Mortgage Loans. TA has fully performed all its

obligations under and relating to the Loan Purchase Agreement. (Chell Decl. ¶ 31).

28.    Section 2.02 of the Loan Purchase Agreement provides:

> With respect to each Mortgage Loan, the Purchaser [TA] shall be
> entitled to (1) the principal portion of all Monthly Payments due
> after the Cut-off Date, (2) all other recoveries of principal collected
> on or after the Cut-off Date (provided, however, that the principal
> portion of all Monthly Payments due on or before the Cut-off Date
> and collected by the Servicer or any successor servicer after the
> Cut-off Date shall belong to the Seller), and (3) all payments of
> interest on the Mortgage Loans (minus that portion of any such
> payment which is allocable to the period prior to the Cut-off Date).
> [Emphasis added.]

(Chell Decl. ¶ 32 and Ex. E at p. 14).

29.    After the Cut-Off Date (as defined in the Loan Purchase Agreement) for two Mortgage Loans, referred to as the Cardwell no. 100078791/1061552[3] and the Cardwell no. 100082377/10610551 Mortgage Loans (the "PIF Mortgage Loans"), the PIF Mortgage Loans were paid in full ("PIF") by Cardwell, the borrower thereon.  (Chell Decl. ¶ 33).

30.    However, the borrower Cardwell mistakenly sent the payoff payments on the PIF Mortgage Loans, in the aggregate amount of $1,222,129.01 (the "PIF Payments"), to Spectrum, which was no longer the owner of the PIF Mortgage Loans after the Cut-Off Date, rather than to TA or its servicer.  Attached to the Chell Decl. as Exhibit E is a copy of a fax Spectrum sent TA on April 30, 2007, stating that the PIF Mortgage Loans "were paid in full to Spectrum Financial Group."  (Chell Decl. ¶ 31 and Ex. F; Jacob Decl. Ex. B (Answer) at ¶ 10).

31.    The PIF Payments received by Spectrum on the PIF Mortgage Loans after the Cut-Off Date did not belong to Spectrum or the Craigs because TA, as Purchaser, owned the PIF Mortgage Loans and was expressly entitled to the PIF Payments under § 2.02 of the Loan Purchase Agreement.  (Chell Decl. ¶ 35 and Ex. E at p. 14).

32.    On several occasions, continuing through June 4, 2007, TA demanded that Spectrum and the Craigs forward the PIF Payments to TA as required by §§ 2.02 and 7.01 of the Loan Purchase Agreement, and applicable law.  Attached to the Chell Decl. as Exhibit G is a copy of a demand letter sent by TA to Spectrum on June 4,

---

[3] The first number, 100078791, is TA's identification number for the loan, and the second number, 1061552, is Spectrum's identification number for the loan.

2007, demanding that Spectrum remit TA's funds of $1,222,129.01. (Chell Decl. ¶ 36 and Ex. G; Jacob Decl. Ex. B (Answer) at ¶ 11).

33.    Spectrum and the Craigs acknowledged that the PIF Payments belonged to TA, but failed and refused to forward the PIF Payments to TA. (Chell Decl. ¶ 37).

34.    Spectrum's and the Craigs' retention of the PIF Payments was an intentional and unauthorized exercise of control over property belonging to TA, interfering with the lawful right of possession of TA in the PIF Payments. (Chell Decl. ¶ 38).

35.    Craig Sr. and Craig Jr., as the responsible officers of Spectrum, controlled Spectrum and caused it to engage in this conduct towards TA with full awareness that the PIF Payments belonged to TA and intending to interfere with TA's lawful right of possession in the PIF Payments. (Chell Decl. ¶ 39; Jacob Decl. Ex. B (Answer) at ¶ 3).

36.    Accordingly, Craig Sr. and Craig Jr., are liable, jointly and severally, for conversion, in the amount of $1,222,129.01, plus interest from April 30, 2007, the date that Spectrum first acknowledged that it was exercising dominion and control over the PIF Payments, to the date of judgment at an amount of $301.35 *per diem*. (Chell Decl. ¶¶ 40–41).

Dated:  December 7, 2007

MILLER & WRUBEL P.C.


By: _____
Charles R. Jacob III
Haynee C. Kang
250 Park Avenue
New York, New York 10177
(212) 336-3500

Attorneys for Plaintiffs